**NOVO NORDISK OF NORTH AMERICA, INC., Novo Nordisk Pharmaceuticals, Inc., and Novo Nordisk A/S, Plaintiffs,**

v.

**GENENTECH, INC., Defendant.**

**No. 94 Civ. 8634 (CBM).**

United States District Court, S.D. New York.

May 4, 1995.

Albert L. Jacobs, Jr., Mark H. Sparrow, Jesse D. Reingold, Jennifer A. Coen, Rosenman & Colin, New York City, for plaintiffs.

James Ringer, Nicholas Coch, John Kidd, Rogers & Wells, New York City, for defendant.

### DEFENDANT'S MOTION TO DISMISS CLAIMS THREE AND FOUR OF PLAINTIFFS' COMPLAINT

MOTLEY, District Judge.

In this case, plaintiffs seek a declaratory judgment that United States Patent Nos. 4,342,832 (the '832 patent), 4,601,980 (the '980 patent), 4,366,246 (the '246 patent), and 5,221,619 (the '619 patent) are invalid and not infringed by plaintiffs. This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, Title 35, United States Code. Jurisdiction is based on 28 U.S.C. § 1338 while venue is based on 28 U.S.C. 1391(b) and (c).

The parties in this case are involved in the business of genetically-engineered pharmaceutical products. There are three plaintiffs in this action. Novo Nordisk of North America, Inc., is a corporation organized to do business and doing business in the state of Delaware with its principal place of business in New York, Novo Nordisk Pharmaceuticals, Inc., is organized to do business and does business in the state of Delaware but its principal place of business is Princeton, New Jersey, and Novo Nordisk A/S is a corporation organized to do business and doing business under the laws of the Kingdom of Denmark with its principal place of business in Novo Alle, Bagsvaerd, Denmark. Defendant, Genentech, is a corporation organized to do business in the state of Delaware having its principal place of business in South San Francisco, California, and doing business in the Southern District of New York.

Plaintiffs are waiting to gain FDA approval to be able sell Norditropin, genetically-engineered human growth hormone, inside of the United States. Plaintiffs intend to import Norditropin for commercial distribution

in the United States following approval by the FDA.

In March 1993, defendant brought an action against plaintiffs in the U.S. International Trade Commission (ITC) alleging that plaintiffs' product, Norditropin, infringed four of its patents: the '832, '980, '246, and '619 patents. The ITC proceeding was dismissed with prejudice as a sanction for defendant's discovery-related misconduct. As a result of this proceeding, plaintiffs incurred substantial expenses in defending against this action. The Administrative Law Judge (ALJ) determined that two of defendant's patents were invalid, one of the patents was not infringed, and one would be infringed. The very day the ALJ's determination was available plaintiffs filed this action here. The very next day defendant filed an action against plaintiffs in Delaware District Court. Defendant made a motion for transfer which was denied by this Court.

In plaintiffs' complaint, there are four causes of action: non-infringement of the four patents, invalidity of the four patents, antitrust claim based on fraudulent procurement of the '619 patent, and an antitrust claim based on enforcement of patents known to be invalid.

In defendant's motion to dismiss pursuant to Rule 12(b)(6), defendant seeks to have plaintiffs' third and fourth causes of action dismissed. The third claim of the complaint seeks antitrust damages against defendant. It charges two things: the '619 patent is invalid because defendant committed fraud against the patent office by concealing evidence of failed experiments and that plaintiffs suffered an antitrust injury by the costs it ran up in its efforts to defend itself in the ITC proceeding. Plaintiffs' fourth claim makes the allegation that all four of defendant's patents are invalid due to illegal misuse. Specifically, the complaint alleges that defendant misused these patents by including them in certain license agreements that it entered into in 1978 (one with KabiGen AB (Kabi) and the other with Eli Lilly & Company). These license agreements contained illegal "tying" provisions by which defendant could terminate the agreements if Kabi sold rhGH, or Lilly sold recombinantly produced insulin, without using either unpatented defendant microorganisms or defendant's patent technology.

### I. The Standard For Dismissal Under Rule 12(b)(6).

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993); *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985); *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F.Supp. 918, 927 (S.D.N.Y.1989). Therefore, on a motion to dismiss, all factual allegations of the complaint must be accepted as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.) *cert. denied*, —— U.S. ——, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991), and all reasonable inferences must be made in plaintiffs' favor. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *D'Orange v. Feely*, 1995 WL 72374, *4 (S.D.N.Y. February 22, 1995); *Meilke v. Constellation Bancorp*, No. 90–3915, 1992 WL 47342, at *1 (S.D.N.Y. Mar. 4, 1992). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d at 1067 (citation omitted).

For the reasons set forth below, this Court grants defendant's motion to dismiss in part.

### II. Plaintiffs' standing to assert *Handgards* antitrust claim under the "sham" litigation exception to Noerr–Pennington Immunity.

■ Defendant argues that plaintiffs lack standing to assert an antitrust claim because without FDA marketing approval, plaintiffs are in no position to allege any interference by defendant with plaintiffs' ability to receive income from prospective sales of its human growth hormone product. Defendant cites to

*National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Lab.,* 850 F.2d 904, 913 (2d Cir.1988) for this proposition.

However, plaintiffs' complaint does not allege this sort of antitrust injury. Rather, the complaint alleges as the antitrust injury the costs incurred in connection with defending a litigation in which a patentee attempts to enforce patents that are invalid and unenforceable. This is a well recognized type of antitrust injury which comprises the costs incurred in defending a "sham" litigation filed in violation of the antitrust laws. *Rickards v. Canine Eye Registration Foundation,* 783 F.2d 1329, 1334–35 (9th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986). In the patent field, this principle was established in the *Handgards I* and *Handgards II* cases, *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 689, 62 L.Ed.2d 659 (1980), *on remand,* 552 F.Supp. 820 (N.D.Cal.1982), *aff'd,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). These cases established the recoverability of damages by victims of bad faith patent infringement suits. The Ninth Circuit explicitly held that pleading the costs of defending such suits alleges a cognizable antitrust injury.

> Plaintiff must show that the injury for which it seeks to recover is "the type the antitrust laws were intended to prevent" and "flows from that which makes defendant's acts unlawful." In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which "flows" from the antitrust wrong.

> *Handgards I,* 601 F.2d at 997.

■ Because of the confusion surrounding the meaning of "sham" litigation, the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) set out a two-part definition of "sham" litigation for purposes of determining whether or not an antitrust defendant is entitled to immunity from antitrust litigation under the Noerr–Pennington doctrine. The Noerr–Pennington doctrine, which has its roots in the First Amendment, ensures that those who petition the government in good faith for redress are generally immune from antitrust liability. *Id.* at ——, 113 S.Ct. at 1926; *United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 139–40, 81 S.Ct. 523, 530–31, 5 L.Ed.2d 464 (1961); *United States Gypsum Co. v. National Gypsum Co.,* 1994 WL 14648, *1 (N.D.Ill. January 20, 1994); *TRW Financial Systems, Inc. v. Unisys Corp.,* 835 F.Supp. 994, 1011 (E.D.Mich.1993).

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant would realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail ... Under the second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability. *Professional Real Estate Investors,* —— U.S. at ——, 113 S.Ct. at 1928.

The Court warned that the mere fact of losing the underlying lawsuit does not lead to the conclusion that it was a "sham". The lower courts were instructed to remember, "even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Id.* at ——, 113 S.Ct. at 1928.

Defendant argues that according to this standard, plaintiff's fourth cause of action must be dismissed because plaintiff cannot allege any facts showing that defendant's ITC action was objectively baseless. Therefore, Noerr–Pennington immunity is applicable. This court finds and concludes that

plaintiff cannot show that the ITC proceeding was "sham" litigation.

This conclusion is based upon the findings of the ALJ in the ITC proceeding that plaintiff alleges defendant brought in bad faith. Even on a Rule 12(b)(6) motion this court may properly take notice of documents outside of the four corners of the complaint. In *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), the Second Circuit specified under what conditions a district court would be able to take notice of such documents.

> A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason—requiring notice so that the party against whom the motion to dismiss is made may respond—that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

> The stock purchase agreement, Bowles' offering memorandum, and the warrant were documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit. It did not lack notice of those documents; these papers were integral to its complaint. Consequently, though the district court, in light of what it viewed as conflicting precedents in this Circuit, declined to consider these exhibits, it could have viewed them on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim.

*Cortec Industries, Inc.*, 949 F.2d at 48; *I. Meyer Pincus & Assocs. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991).

From the facts of this case, plaintiffs are clearly on notice of the decision in the ITC proceeding. This proceeding is not just integral to plaintiffs' fourth claim, it is the sole basis for that claim. Therefore, it is properly before this Court. After becoming familiar with the ITC proceeding, it is clear why plaintiffs do not wish for this Court to consider the determinations of the ALJ. These determinations completely undermine plaintiffs' contentions that the ITC proceeding was a sham. The ITC found (1) based on defendant Genentech's complaint that sufficient bases existed for the ITC to commence an investigation against plaintiffs for infringement of these patents; (2) the ALJ denied no less than six motions for summary determination, five brought by plaintiffs attacking the substance of defendant's patents; and (3) the ALJ ultimately held (although based on an incomplete record) that plaintiffs were infringing defendant's '980 patent. Therefore, defendant's ITC proceeding can in no way be termed objectively baseless because the facts speak loudly to the contrary. As a result, defendant has Noerr–Pennington immunity and plaintiffs' antitrust cause of action based upon *Handgards* allegations must fail and be dismissed.

## III. The Effect of the Noerr–Pennington Immunity on Plaintiffs' third claim.

The third claim of plaintiffs' complaint alleges a *Walker Process* claim. Plaintiffs have argued that defendant's procurement of the '619 patent by fraud is a violation of section 2 of the Sherman Act, 15 U.S.C. § 2. A *Walker Process* claim arises when a patentee baselessly institutes litigation to enforce a patent known to be unenforceable because the patent was procured by fraud. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The Court decided:

> We have concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of section 2 of the Sherman Act provided the other elements necessary to a § 2 case are present. In such event the treble damage provisions of § 4 of the Clayton Act would be available

to an injured party.[1]  *Id.* at 174, 86 S.Ct. at 349.

Although the parties have not adequately briefed the *Walker Process* claim with respect to the Noerr–Pennington Immunity, this court reaches that question to determine if plaintiffs have standing and have adequately pled a § 2 violation of the Sherman Act. Under the Noerr–Pennington doctrine, a person cannot be liable for filing a lawsuit under the antitrust laws unless that lawsuit was not filed in "good faith" or, was "objectively baseless". *Professional Real Estate Investors,* ―― U.S. at ――, 113 S.Ct. at 1928. As another District Court referred to the relationship between a *Walker Process* claim and Noerr–Pennington immunity, this is an area "choked with the fog of uncertainty". *United States Gypsum Co., supra,* 1994 WL 14648, *3 (N.D.Ill. January 20, 1994).

In *Professional Real Estate Investors,* the holding explicitly did not apply to *Walker Process* claims. The Court wrote, "We need not decide here whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." *Professional Real Estate Investors,* ―― U.S. at ―― n. 6, 113 S.Ct. at 1929 n. 6. The Federal Circuit in *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.,* 15 F.3d 1573, 1583 n. 10 (Fed. Cir.1993) declined to decide the applicability of Noerr–Pennington immunity to a litigant who sues on a patent obtained by fraud. Therefore, it is unclear whether defendant has Noerr–Pennington immunity. As a result, this Court cannot rule that plaintiffs' third claim for relief based upon fraud on the patent office in obtaining the '619 patent should be dismissed.

■ From the complaint, plaintiffs have adequately pled a § 2 violation of the Sherman Act. There are three distinct civil claims that can be made under the Sherman Act, 15 U.S.C. § 2 (1982): (1) monopolization;

(2) attempted monopolization; and (3) conspiring to monopolize. *Broadcast Music, Inc. et al. v. Hearst/ABC Viacom Entertainment Servs.,* 746 F.Supp. 320, 326 (S.D.N.Y. 1990). Plaintiffs have alleged in ¶ 64 of the complaint that, "Genentech has unlawfully monopolized the production of human growth hormone in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, with the specific intent to so monopolize." To establish a monopolization claim, the claimant must demonstrate monopolizing conduct coupled with monopoly power in the relevant market. *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir. 1990). Monopolizing conduct is defined as "the willful acquisition or maintenance of monopoly power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (quoting *United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). Plaintiffs claim that defendant procured the '619 patent by fraud and enforced it against them in the ITC proceeding to prevent plaintiff from entering the United States market. In addition, plaintiff claims that defendant has monopoly power because defendant possesses at least a majority of the United States market in human growth hormone and there is only one other firm currently in the United States market. Therefore, plaintiffs have adequately pled the requisite conduct for a monopolization claim under § 2 of the Sherman Act to survive defendant's motion to dismiss.

### Conclusion

Therefore, this Court partially grants defendant's motion to dismiss. Due to the reasoning set out above, plaintiffs' third claim for *Walker Process* antitrust injury is not dismissed while plaintiffs' fourth claim for *Handgards* "sham" litigation antitrust injury is dismissed.

---

1. The Court explained in the concurrence by Mr. Justice Harlan:

    Conversely, such a private cause of action would not be made out if the plaintiff: (1) showed no more than invalidity of the patent arising, for example, from a judicial finding of 'obviousness,' or from other factors sometimes compendiously referred to as 'technical fraud';

    or (2) showed fraudulent procurement, but no knowledge thereof by the defendant; or (3) failed to prove elements of a § 2 charge even though he has established actual fraud in the procurement of the patent and the defendant's knowledge of that fraud. *Walker Process Equipment, Inc.,* 382 U.S. at 179, 86 S.Ct. at 351.

## ORDER

Pursuant to the accompanying opinion, plaintiffs' fourth cause of action is dismissed.

So ordered.